**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**WESLEY MORRIS GOODWIN,**

      **Plaintiff,**

v.                                   **CASE NO. 2:11-cv-00594**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

**M E M O R A N D U M   O P I N I O N**

    This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Wesley Morris Goodwin (hereinafter referred to as "Claimant"), filed an application for SSI on November 12, 2008, alleging disability as of November 12, 2008, due to amnesia, traumatic brain injury, back and leg problems, arthritis in knees, headaches and hearing problems.  (Tr. at 15, 128-33, 147-55, 178-83, 196-200.)  The claim was denied initially and upon reconsideration.  (Tr. at 15, 68-72, 83-85.)  On August 26, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 86-87.)  The hearing was held on April 19, 2010 before the Honorable Harry C. Taylor, II.  (Tr. at 29-65, 97-102, 103-08.)  At the conclusion of the hearing, Judge Taylor gave Claimant's representative an additional ten days in order to submit the results of a neuropsychological examination.  (Tr. at 15.)  No records were received and the record was closed.  Id.  By

decision dated June 17, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-28.) The ALJ's decision became the final decision of the Commissioner on August 2, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) On September 1, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The

burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2011).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of mood disorder, amnestic disorder, NOS, and chronic back and shoulder pain.  (Tr. at 17-18.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 18-20.)  The ALJ then found that Claimant has a residual functional capacity for sedentary to light work, reduced by nonexertional limitations.  (Tr. at 20-27.)  Claimant has no past relevant work.  (Tr. at 27.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as laundry worker, hand packer, mail room clerk, surveillance systems monitor, and assembler which exist in significant numbers in the national economy.  (Tr. at 27-28.)  On this basis, benefits were denied.  (Tr. at 28.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In <u>Blalock v. Richardson</u>,

substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 39 years old at the time of the administrative hearing.  (Tr. at 32.)  He has a high school education with no special education.  (Tr. at 35, 255.)  In the past, he testified that his father told him that he had "worked on computers for 18 years."  (Tr. at 42.) Claimant's employment records do not affirm this testimony and indicate that he had no employment history prior to 1988 and no employment history after 2000.  (Tr. at 135-36.) For the eleven years that he reported income ($9,543.27 total income), only the year 2000 reflects employment with a company named "Computer Pile Com Inc., Southport, Indiana" wherein he earned $336.00 in the entire year.  (Tr. at 135-37.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

Physical Health Evidence

On February 5, 2008, Claimant had an evaluation at the Charleston Area Medical Center [CAMC] Physical Therapy and Sports Medicine Center for neck, left shoulder, and low back pain.  (Tr. at 214-22.)  Physical Therapist Lynn Isernia recommended physical therapy once to twice a week for four weeks.  (Tr. at 220.)  Claimant did not show for physical therapy appointments and he was discharged from the program on February 29, 2008.  (Tr. at 214.)

On June 26, 2008, Claimant presented to the CAMC Emergency Department with complaints of toothache.  (Tr. at 240-42.)  Brendan L. O'Hara, M.D. stated:

> This 38-year-old male scheduled for total mouth dental extraction for August is complaining of pain in multiple teeth.  The pain has been continuous for 3 weeks...He has been on amoxicillin for 3 weeks.  He has no fever or chills and no facial swelling...He was given prescription for oxycodone 5 mg, number 20 tablets.  He was told to follow-up [with a] dentist for ongoing pain management.

(Tr. at 241.)

On August 12, 2008, handwritten notes from Family Care indicate Claimant was treated for "possible arthritis in thumb... hypertension...tobacco use...acute sinusitis."  (Tr. at 223.)

On November 6, 2008, Claimant presented to the CAMC Emergency Department with complaints of anxiety and memory loss. (Tr. at 235-39.)  Richard A. Capito, attending physician, wrote:

This is a 38-year-old white male who was brought by EMS with complaints of memory loss according to the EMS report. The patient complains of fall with memory loss over 4 hours ago. The patient was served with a domestic violence petition by the police department and then he said he was amnesic and he has fallen a few hours prior to being served. According to the EMS report, the patient was able to walk down 8 steps and was able to pick up the special items, bending and walking without effort prior to being transported. While arriving in the ER, the patient states that he is not aware of his location. He has had a time loss, however, he denied any history of fall while interviewing in the ER. The patient does not have any external signs of any injuries other than a slight superficial abrasion on the right forehead. No bruises or lacerations noted. The patient also has a history of chronic back pain...

As described earlier of the patient's social situation, he was actually served with a domestic violence petition by the police department and the episodes of amnesia or the complaint of amnesia started after he was served with the domestic violence petition. Clinically he is stable except for the sinusitis, which we are going to treat. I am going to put the patient on amoxicillin 500 mg 1 p.o.q. 12h for 10 days. Also, the patient wanted his blood pressure medication refills. I am going to give him a refill of Tenoretic 50/25 one p.o. daily, quantity 30. The patient will be discharged to the men's shelter.

(Tr. at 235-37.)

On November 6, 2008, John Alan Willis, M.D., CAMC, reviewed a CT without contrast scan of Claimant's head and concluded:

I have for comparison a study from 12/28/2007. Brain parenchyma is normal without evidence of infarct, hemorrhage, or mass. There has been no interval change.

On the bone windows, there is opacification of the right maximillary sinus and correlation concerning possible sinusitis is recommended. There is also mucosal thickening involving multiple ethmoid cells.

IMPRESSION:
1.      Negative noncontrasted CT of the brain.
2.      Paranasal sinus disease.

(Tr. at 239.)

On November 6, 2008, Dr. Willis also reviewed an x-ray of Claimant's chest and

concluded: "Compared with 12/28/2007, the lungs remain clear.  Heart is at the upper limits of normal for size and the pulmonary vascularity is normal.  IMPRESSION: No active cardiopulmonary disease." (Tr. at 238.)

On November 8, 2008, Claimant presented to the CAMC Emergency Department with complaints of back pain and right shoulder pain.  (Tr. at 228-33.)  Leon S. Kwei, M.D., attending physician, wrote:

> This is a 38-year-old white male, who was brought to EMS with complaints of low back pain and right shoulder pain.  This is a patient actually seen here two days ago for anxiety and transient memory loss.  Please see the ED evaluation at that time for further details.  To recap his story, the patient states he fell down a few steps at home in the porch of the house, however, today he did not show any signs of confusion.  Upon arrival, the patient was also able to recognize me, who had seen him that 2 days ago and he was able to recall the incident.  He states that during the fall 2 days ago at [the] house he hurt his back as well as right shoulder...
>
> EMERGENCY ROOM DIAGNOSTIC WORKUP: This patient's L-spine x-ray is negative for any acute fracture, dislocation or subluxation.  Also, the right shoulder x-ray reviewed and showed no signs of dislocation or subluxation...
>
> I explained to the patient the findings, at that time, he knew he was going to be discharged.  The patient states that he does not know how he came here.  We suspect malingering and probably secondary gains and reviewing the ED evaluation 2 days ago, the patient did not have any prior amnesic episode until he was served the restraining order, however we consulted Social Service regarding this issue placement since the patient is medically clear to be discharged.  Please see detailed notes by the social worker regarding this issue.  The patient was told that we are going to make arrangements for the patient to go to the men's shelter.  However, at that time, the patient came up with friend's home number and spoke to a friend, who indicated that he will be okay to go to the patient's friend's mother and the patient came up with the address and we provided bus ticket for the patient to reach friend's mother's house...

(Tr. at 229-30.)

On November 12, 2008, Claimant presented to the CAMC Emergency Department with complaints of memory loss. (Tr. at 228-33.)   John S. Bodkin, D.O., attending

physician, wrote:

> This is a 38-year-old white male who presents to the Emergency Department via walking complaining of memory loss. He then relates that on 11/06 he fell through a porch. He says the next thing he remembered he woke up talking to the EMS and police. He had shoulder and back pain. He says since then he has been spending a few days at the men's shelter. In the midst of this he has a domestic violence petition filed against him and he was evaluated by the police...
>
> He does not seem to have any problem with his memory. He related the same histories on 11/06 and 11/08 when he was here. I am not quite sure why he is here and when I asked the patient the problem he is having with his memory he really cannot relate this to me. He did have negative workups on 11/06 and 11/08...
>
> He was told to follow up at Family Care. Apparently the men's shelter contacted Family Care and they instructed him to come here.

(Tr. at 225.)

On November 17, 2008, Claimant was treated at West Virginia Health Right, Inc.

(Tr. at 247.) All boxes on the form were checked as "NML [normal]" save for "Neurological"

which was checked as "ABN [abnormal]" due to "memory loss." (Tr. at 247.)

On November 18, 2008, Claimant had a chest x-ray at CAMC wherein John Mega,

M.D. reported: "No radiographic evidence for an acute process. No interval change from

11/06/08." (Tr. at 249.)

On December 10, 2008, Claimant was treated at West Virginia Health Right, Inc.

(Tr. at 248.) Anna M. Holliday, MSN [Master of Science in Nursing], CFNP [Certified

Family Nurse Practitioner], stated:

> Pt [patient] presents with c/o [complaints of] injury from 11/08...ED [Emergency Department] report reviewed; pt presented multiple time with chief complaint unclear. Questionable amnesia surrounding timeline of domestic violence petition. Pt cannot clarify history of injury. CT head normal, lumbar x-ray normal, chest x-ray normal + THC [Tetrahydrocannabinol (psychoactive compound in marijuana)] in ED. Pt

now lives at men's shelter.  No acute issues today...

Assessment:
poor historian, drug use, + marijuana
chronic low back pain, right leg pain (films WNL [within normal limits])...

(Tr. at 248.)

On March 7, 2009, Claimant was treated at CAMC Emergency Department for complaints of left ear pain.  (Tr. at 287, 297.)  Jessica L. Sop, D.O., diagnosed "[l]eft otitis media" and prescribed Auralgan otic drops 3 drops to left ear, amoxicillin 875 mg p.o."  (Tr. at 288, 298.)

On March 11, 2009, a State agency medical source provided a Disability Determination Evaluation of Claimant.  (Tr. at 250-53.)  The evaluator, Nilima Bhirud, M.D., concluded: "The claimant is a 38-year-old male who gives history of fall on November 6, 2008.  The patient has tenderness over cervical spine, but the range of motion was normal.  He also seems to have impaired memory."  (Tr. at 252.)

On April 2, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA] form.  (Tr. at 274-81.)  The evaluator, James Egnor, M.D., found that Claimant's primary diagnosis was "MORBID OBESITY" and his secondary diagnosis was "TBI" [Traumatic Brain Injury].  (Tr. at 274.)  Dr. Egnor found that Claimant could do medium work and perform all postural limitations occasionally save for "[c]limbing ladder/ropes/scaffolds, which he could "[n]ever" do.  (Tr. at 275-76.)  He found that Claimant had no manipulative, visual, or communicative limitations and no environmental limitations save to avoid concentrated exposure to extreme cold, vibration, and hazards.  (Tr. at 277-78.)  Dr. Egnor concluded: "The complaints are regarded as not fully credible and the RFC is reduced to do only medium work with some postural and

environmental limitations as noted." (Tr. at 281.)

On May 13, 2009, Claimant was treated at CAMC Emergency Department for "[l]eft ankle pain." (Tr. at 283, 299.) Leon S. Kwei, M.D. concluded: "Three views of the ankle, no fracture per Dr. Muto...Left ankle sprain...Discharge home.". (Tr. at 283-85, 299-301.)

On July 2, 2009, Claimant was treated at CAMC Emergency Department for complaints of "[a]bdominal pain, chest pain, vomiting blood." (Tr. at 302.) William N. Payne, M.D. stated:

> The patient apparently was found by EMS "patient in tub yelling for help". The police were on the scene apparently he had drunk a pint of vodka, although he says three shots. No mention was made of any blood at the scene and he was brought to the hospital...He says the pain is burning in his abdomen, he had it last night. He has been drinking the tequila yesterday and vodka today. He says he does not normally drink very much. The pain went up into the chest today. He vomited several times, he thinks there might have been some bloody material in it. He is not really sure...

> The patient was found to be alcohol intoxicated with alcohol of 150. Hemoglobin and hematocrit were normal. Cardiac enzymes were negative. EKG showed no ischemia...It was felt he may have gastritis, possibly from his drinking. He denies any regular alcohol abuse but there was some question as his girlfriend stated he had been drinking tequila yesterday which he additionally denied...He was discharged with his girlfriend who will watch him and return to ER if worse.

(Tr. at 302-03.)

On July 7, 2009, a State agency medical source provided a "Case Analysis." (Tr. at 295.) The evaluator, A. Rafael Gomez, M.D. concluded: "This patient was reviewed on 04/02/09 and reduced to medium work. At reconsideration a one line note added the diagnosis of left ankle sprain. There is no change in the previous RFC." Id.

Mental Health Evidence

On December 4, 2008, Claimant was referred to Prestera Center East by the

10

Charleston Men's Shelter for a comprehensive psychiatric evaluation.  (Tr. at 243-46.)

Louann Munday, APRN [Advanced Practice Registered Nurse], BC-FNP [Board Certified -

Family Nurse Practitioner], BC-ADM [Board Certified - Alcohol, Drug Abuse and Mental

Health], stated:

> Wesley said he fell through a porch at someone's house on November 6, 2008.  He is unsure how long he was in the hospital or exactly when he fell but he has been back to the hospital three times.  He said he has no memory now.  He has a five-year-old son and by another woman he has a teenage son and daughter.  He doesn't see them and he is uncertain how old they are.  I asked if he was single or married but he said he is unsure if he has ever been married.  He thinks he is single but not really sure...
>
> PSYCHOSOCIAL HISTORY:
> He was born in Greensburg, Indiana.  He has two sisters.  He is unsure if he is older or younger.  He is unsure if he was raised by his parents.  He can't remember his sisters.  He only knows he has sisters because his father told him...
>
> MENTAL STATUS EXAMINATION:
> On exam today, the client noted to be a mildly obese Caucasian American male.  He was disheveled.  He has very long unkempt hair.  He has a mustache and beard that are quite long.  No motor abnormalities.  Mood appears to be dysphoric. Affect was broad. No suicidal or homicidal ideation. Thought process and content within normal limits.  Cognitively he was alert.  He was oriented to person, place, and time.  Memory for immediate, recent, and remote events intact per testing only.  He could answer how many states there were in the United States and what temperature water froze.  He knew nothing about his family or anything about his history.  He did not know who the president was.  Insight and judgment good per standard tests.
>
> DIAGNOSES:
> Axis I        Mood Disorder due to Memory Loss.  293.83
> Axis II       Deferred
> Axis III      Poor Memory
> Axis IV       Psychosocial stressors: 09
> Axis V        Current GAF: 65

(Tr. at 243-45.)

On March 16, 2009, Joann B. Daley, Clinical Psychologist, provided a

"Neuropsychological Screening Profile" of Claimant.  (Tr. at 254-59.)  She noted:

> He works daily as a volunteer at the Kanawha County Wellness and Recovery Center...
>
> He said he worked for 17 years in Indiana and W. Va.  "I built, repaired, and programmed computers."  He said a friend, Reno, who has known him since he came to W. Va., told him he started a computer shop in Parkersburg ten years ago but had to close it because his partner went to Iraq...

(Tr. at 255.)

Regarding IQ, Ms. Daley stated that Claimant tested on the WAIS-III as having the following scores: Verbal IQ 96, Performance IQ 99, Full Scale IQ 98, Verbal Comprehension 101, and Perceptual Organization 105.  (Tr. at 256.)  Regarding the memory assessment testing, she concluded that he was average in the areas of level of consciousness, orientation, attention, language, comprehension, repetition, naming, constructions, calculations, reasoning, similarities, and judgement.  (Tr. at 257.)  However, she found he was "mildly impaired" in memory.

Ms. Daley concluded:

> MENTAL STATUS EXAMINATION: Appearance: He has almost waist length brown bushy hair, parted in the middle and a thick, trimmed moustache and beard.  He wore a heavy black jacket and sweat pants his arms and fingers are noticeably short.  Attitude/Behavior was polite and cooperative.  Speech was spontaneous, relevant, and coherent and Orientation was correct in all spheres.  Mood was normal and Affect was solemn and restricted.  There was no evidence of Thought Process impairment.  Thought Content:  There was no evidence of delusions, paranoia, preoccupations, obsessions, or phobias.  Perceptual: There was no evidence of illusions, depersonalizations, deja vu, or hallucinations.  Insight was limited and Judgment was average on the basis of the WAIS-III Comprehensive subtest score of 11.  There was no indication of Suicidal Ideation.  Immediate Memory: Within normal limits based on immediate recall of all four words.  Recent Memory: Moderately deficient based on recall of two of four words after thirty minutes.  Remote Memory: Inconsistent based on his ability to recall details of his personal history.  He said that he didn't recall high school but had given his graduation date on his application.  He knew the ages of his children in Indiana and who

he had a computer business with several years ago.  <u>Concentration</u> was mildly deficient on the basis of the WAIS-III Digit Span subtest score of 7. <u>Persistence</u>: Within normal limits as demonstrated by test taking behavior. <u>Pace</u>: Within normal limits as observed during the evaluation.  <u>Social Functioning During the Evaluation</u>: Within normal limits based on clinical observation of his social interaction with the examiner during the evaluation. He was very polite and seemed sincere and eye contact was good.

<u>SOCIAL FUNCTIONING - SELF REPORTED</u>: He said he has some acquaintances at the men's shelter, where he has been since mid-November and gets along fairly well with them...He used to play chess with a fellow who left.  When he is volunteering at the Wellness and Recovery Center, four or five hours every week day, "I talk to people who come in and try to keep a friendly environment...I mostly listen to other people about their issues and their problems...I use the Internet for people who can't get to peer support places."  He hasn't seen his girlfriend or son since he left and she refuses to respond to his calls.

<u>DAILY ACTIVITIES</u>: He is awakened at 7 a.m., walks to Manna Meal for breakfast, and walks to the Wellness and Recovery Center, which is nearby. He leaves there for lunch at Manna Meal and everyday he walks around town several times a day.  "I can't make it too far because of my knees and back." He goes back to the shelter for supper, watches television and listens to the radio.  On week-ends he mostly stays there.  In regard to his activities when he was with Melissa, he said he doesn't remember what he did.  "I don't remember by own son...I'm sure I did something but I don't remember."

<u>DIAGNOSIS</u>:

| | | |
|---|---|---|
| Axis I | 294.8 | Amnestic Disorder NOS |
| Axis II | V71.09 | No Diagnosis |
| Axis III | | High blood pressure and head injury by self report. |

<u>DIAGNOSTIC RATIONALE</u>: The diagnosis of Amnestic Disorder NOS is made because memory loss symptoms do not meet criteria for a more specific disorder.

<u>PROGNOSIS</u>: Unknown.

<u>CAPABILITY</u>:  He would be considered competent to manage disability benefits in his own best interest.

(Tr. at 257.)

On March 27, 2009, a State agency medical source completed a Psychiatric Review Technique form [PRTF]. (Tr. at 260-73.) The evaluator, John Todd, Ph.D. concluded that Claimant's impairment was "[n]ot [s]evere" for either category of "Organic Mental Disorders" i.e. "Amnestic D/O [disorder] NOS [not otherwise specified]" or "Substance Addiction Disorders" i.e. "Cannabis Abuse." (Tr. at 260-61, 268.) Dr. Todd found that Claimant had a mild degree of limitation regarding restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace, no limitation regarding maintaining social functioning and no episodes of decompensation, each of extended duration. (Tr. at 270.) He marked that the evidence does not establish the presence of the "C" criteria. (Tr. at 271.) Dr. Todd concluded:

> Clmt [claimant] is partially credible w/ [with] complaints inconsistent w/ objective evidence. Clmt c/o [complains of] problems with memory but TS [treating source] noted memory was intact w/ CE [clinical evaluation] noting mod [moderate] def [deficiency] in remote memory which is given little weight as clmt's daily activities are inconsistent with memory problems, ER [emergency room] noting normal findings, valid ave [average] IQ received at psych CE and only mild impairment in memory noted on neuro screening. As clmt was found to be abusing drugs at ER visit and from physical TS, though he denied any SA [substance abuse] at CE, calls into question clmts veracity. There is no evidence of severe limitations due to a mental D/O [disorder] and is considered NON-SEVERE.

(Tr. at 272.)

On July 17, 2009, a State agency medical source provided a "Case Analysis." (Tr. at 296.) The evaluator, Holly Cloonan, Ph.D. concluded: "I have reviewed all the evidence in file and the PRTF of 3/27/09 is affirmed as written." (Tr. at 296.)

On September 18, 2009, Claimant was treated at CAMC Emergency Department for "I do not know." (Tr. at 306.) Leon S. Kwei, M.D. stated:

> Per the EMS run sheet, they were dispatched for a person lying down. They

stated that the patient would not tell them what his complaint was about. They report that he was reportedly being arrested by the Charleston Police Department and became unresponsive. They picked him up and he started cursing them and stated that he did not want them to touch him and he didn't consent to blood test, again he did not have any real complaints. When I talked to the patient, the patient tells me that he is not sure why he is here. He says he just wants to die. He does not have any definite complaints other than he wants to die. He says that he wants to be out of his restraints. I actually did see him as I went into the room to evaluate him he was already belligerent with the staff trying to hit our staff and our security guard, at that point he was being restrained for his safety and our safety...The patient was actually in the emergency room earlier in the day and left without being seen. At that point from [what] everyone is telling me is that the patient was alert and oriented and had no other complaints at that time. Again, the patient continues to tell me to get the f____ [out] of his room and that I am not going to be doing any exams on him...

The patient was placed on restraints all four extremities for his protection and ours. We will order ancillary labs included CBC, CMP, urinalysis, drug screen, alcohol level and a TSH.

At this point, the plan will be to consult Behavioral Medicine team after these ancillary labs have been obtained as the patient is stating that he wants to die, and we will consult them for suicidal ideation.

(Tr. at 306-07.)

On September 19, 2009, Claimant was admitted to Mildred Mitchell-Bateman Hospital, and wherein he remained a patient until his discharge on September 30, 2009.

(Tr. at 309-22.) In the admission summary, Patricia Woods, Psychologist, wrote:

The certification was completed in the CAMC ER. He was taken to the ER via EMS after interactions with the police following violation of a restraining order completed by the police. He was uncooperative with the EMS. He reportedly demanded to leave AMA [Against Medical Advice] and became physically aggressive and required physical/chemical restraints. According to the certifying social worker, "He was crying. Stated he was suicidal. Screaming, cursing."...

Most recently Mr. Goodwin has been residing at his girlfriend's, Sherry's home. He reported that they had been dating for only a few months. He reported that after their recent break up he was leaving her home and fell. When the EMS came after he had fallen and hurt his knees, he reported that

15

he stated, "I'd rather kill myself than go back to her." He stated that this was misunderstood.

Mr. Goodwin reported that approx. a year ago he fell through a friend's porch and sustained a head injury. He reported that he was treated at CAMC for the injury and then discharged to the Men's Shelter in Charleston due to being homeless and having no income. He reported experiencing headaches since that injury. He did not lose consciousness following the injury. He does not experience seizures. He denied alcohol and drug use. He was positive for cannabis at the time of admission.

MENTAL STATUS EXAMINATION:

Mr. Goodwin appears older than his stated age. He is of average height and stocky build. His legs appear abnormally short in proportion to his torso. His fingers were thick and clubbed on the ends. His coarse gray hair was long and thinning. His beard was ungroomed. He appeared disheveled and unkempt.

The patient was alert and oriented to person, place, time and situation. He tended to intellectualize and repeatedly provided the names of persons he had worked with at the WV Mental Health Consumer's Association or at the Disabled American Veteran's Administration and that he had volunteered for them but had never been a client. His speech was free of impediment but of normal rate, volume and prosody. His mood was mildly dysphoric and his affect was mood congruent. He denied abnormal perceptions. No overtly delusional thought content was elicited. His recent and remote memories were grossly intact. Intellectual functioning is estimated to be in the average range. His insight is limited. His judgment is poor.

DIAGNOSTIC IMPRESSION:
Axis I:            R/O [rule out] Mood Disorder NOS
                   Cannabis Abuse
                   R/O Alcohol Abuse
Axis II:           Diagnosis Deferred
Axis III:          HTN, S/P Cholecystectomy, R/O TBI
Axis IV:           Homeless, recent break up with girlfriend
Axis V:            GAF [Global Assessment of Functioning] = 40 (current)

CONCLUSIONS AND RECOMMENDATIONS:
The reliability and completeness of Mr. Goodwin's self-report is considered to be limited. He tends to blame the treatment he received by EMS workers and medications he received in the ER for his hostile and aggressive behaviors. He was not forthcoming with information regarding drug/alcohol use which may have contributed to his behaviors.

16

Collateral information should be obtained to help clarify the patient's psychosocial history. A MICA [Mentally Impaired Chemically Addicted] referral is recommended. Encourage patient to participate in on-unit therapeutic activities. He does not appear to be at risk for suicide, assault or elopement at this time.

(Tr. at 320-21.)

In admission notes, Mahmand Mohamed, M.D., opined Claimant's GAF to be 35-40 and stated: "Aggression and impulsivity could interfere with the compliance with treatment. The patient has limited insight which will make it hard for him to accept any treatment or recommendation...ESTIMATED LENGTH OF STAY: One to two weeks depending upon the observation by the treatment team on the unit." (Tr. at 314-15.)

In the discharge summary from Mildred Mitchell-Bateman Hospital, Antonio R. Diaz, M.D., stated:

DISCHARGE DIAGNOSES:
AXIS I.     Mood Disorder, NOS
            Cannabis abuse
     II.    None
     III.   Hypertension
            Dermatitis, NOS
     IV.    Problem with primary support system
     V.     Discharge GAF: 50

CONDITION OF PATIENT AT DISCHARGE: The patient was clinically stable at time of discharge.

MENTAL STATUS EXAMINATION: Patient appeared older than his stated age. Appeared slightly disheveled. Appropriate in his interaction with the staff and other patients. Speech - linear and goal directed. Denied paranoia or any delusional ideation. Denied hallucinations. Denied suicidal ideation. Insight - partial; Judgment - fair...

HOSPITAL COURSE: Patient was not started on any psychotropic medications because there were no clearcut indications for any. Patient had been reiterating that he was just reacting to the situation with his girlfriend and that there was "nothing wrong with me". Patient was discharged on Sept. 30, 2009 with a mental state that was free of psychotic or severe affective

symptoms.

(Tr. at 309-11.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly analyze the credibility of Claimant's lay witnesses, Joseph Edward Cunningham and Cheryl Fredrick, or to properly consider their testimony regarding Claimant's headaches, behavior, depression, and knee pain; and (2) the ALJ failed to take into account Claimant's repeatedly low GAF scores. (Pl.'s Br. at 5-8.)

The Commissioner's Response

The Commissioner asserts that the ALJ's decision is supported because substantial evidence supports the RFC for unskilled work in a low stress work environment and (1) Claimant's lay witnesses were not acceptable medical sources pursuant to 20 C.F.R. 416.913 regarding Claimant's medically complaints; and (2) the GAF scores were inconsistent with the objective clinical findings in the record . (Def.'s Br. at 10-16.)

Analysis

Weighing Opinion Evidence

Claimant first argues that the ALJ failed to properly analyze the credibility of Claimant's lay witnesses, Joseph Cunningham and Cheryl Fredrick, or to properly consider their testimony regarding Claimant's headaches, behavior, depression, and knee pain. (Pl.'s Br. at 5-8.) Claimant asserts that "the ALJ disregards the lay witness testimony on the sole grounds that each is not a treating source. However, according to 20 C.F.R. 404.1513(e), an ALJ must consider the observations by non-medical sources regarding how an impairment affects claimant's ability to work." (Pl.'s Br. at 5.)

The Commissioner argues that the ALJ considered the opinions of Joseph Cunningham and Cheryl Fredrick regarding Claimant's ability to work, but noted they "are not acceptable medical sources pursuant to 20 C.F.R. 416.913 (Tr. 25-26).  Therefore, no weight was given to their opinions." (Def.'s Br. at 14.) The Commissioner further noted that the ALJ properly rejected the hypothetical questions by Claimant's representative that were based on limitations assessed by the lay witnesses.  Id.

Claimant responded: "The importance of lay testimony in Social Security cases is underscored by the myriad regulations and rulings devoted to that subject...Thus, in this case, the ALJ's offhand dismissal of the lay witness testimony is unacceptable."  (Pl.'s Response Br. at 2-3.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d) (2011).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. § 416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).   Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's

opinion.  Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

20 C.F.R. 416.913(d) (2011) states:

> *Other sources*.  In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments.

Per 20 C.F.R. § 416.913(d), an ALJ "may" consider evidence from "other sources" in addition to evidence from the acceptable medical sources listed in paragraph (a) of the section, in order to determine how a claimant's ability to work is affected and if the claimant is a child, how a claimant typically functions compared to children of the same age who do not have impairments.  Friends are listed as "other sources."   20 C.F.R. § 416.913(d)(4).

In the subject case, the ALJ considered the testimony of Claimant's friends, Joseph Cunningham and Cheryl Fredrick, and reached these conclusions:

> With regard to the opinion evidence, Joseph Edward Cunningham, testified at the hearing noting that he once served as the claimant's career support specialist at the Kanawha County Wellness and Recovery Center, but currently knew him as a friend.  The witness testified that other than life experience, he had no specified education for counseling, but reported he had seen the claimant for a period of eighteen months to two years for anywhere from fifteen minutes to a couple of hours during each session in his capacity as career support specialist.  Mr. Cunningham testified the claimant's memory was "not good."  He testified the claimant had helped develop some computer information at the Wellness and Recovery Center.  He reported the claimant worked for about two weeks, then "totally forgot about what we were

doing," but indicated the information came back to him just a few days later. Mr. Cunningham noted the claimant was "just bummed out." He reported the claimant could work on a task anywhere from an hour to three hours. Mr. Cunningham noted the claimant kept a headache, but the pain varied. He further testified he thought the claimant's "knees hurt him a lot more than he let on." The undersigned has given some consideration to the testimony of Mr. Cunningham. However, the witness is not an acceptable treating source pursuant to 20 C.F.R. 404.1513, thus no weight is given to his opinions.

Also testifying at the hearing was the claimant's fiancé Cheryl Fredrick. She testified that the claimant could not walk more than a couple of blocks and when he did, he was not able to "do anything the next day." She reported the claimant suffered from headaches daily and indicated he has no daily pattern, suggesting he either stays up for days on end, or stays in bed. Ms. Fredrick testified that the claimant's ability to stay on task depended on his pain level. The undersigned has taken the testimony of Ms. Fredrick into consideration. However, the witness is not an acceptable treating source pursuant to 20 C.F.R. 404.1513 and therefore no weight is afforded her opinion.

(Tr. at 25-26.)

The undersigned finds that the ALJ did not err in his consideration of the testimony of Claimant's friends. The ALJ considered the discretionary testimony evidence and decided to give it no weight, which was his prerogative. The ultimate decision about disability rests with the Commissioner. 20 C.F.R. § 416.927(e)(1) (2011). The undersigned also reviewed this opinion evidence and agrees with the ALJ that it had no persuasive value whatsoever.

GAF

Claimant next argues that the ALJ did not take into account his low GAF scores: "Goodwin was taken to Mildred Bateman Hospital on September 19, 2009, and at admission his GAF score was 35-40. (Tr. 310) Upon discharge, his GAF was 50. (Tr. 310) On September 22, 2009 physicians at Mildred Bateman Hospital determined that Goodwin's GAF at the time was 40. (Tr. 321)" (Pl.'s Br. at 6-7.)

The Commissioner responds that

> the 3 GAF scores were not consistent with the objective clinical findings in the record. Significantly, the medical providers who assessed the GAF scores ranging between 35 and 50 never opined that Plaintiff was disabled or had functional limitations that precluded him from all work (Tr. 309-22). To the contrary, the hospital psychiatrist noted that the reliability and completeness of Plaintiff's self-report was considered to be limited; Plaintiff tended to blame the EMS workers and medications he received in the emergency room for his hostile and aggressive behaviors; and that Plaintiff was not forthcoming with information regarding drug/alcohol use which may have contributed to his behaviors (Tr. 321). Although he assessed a GAF rating of 40 (Tr. 321), the psychiatrist did not deem it medically necessary to prescribe any psychotropic medications (Tr. 311).

(Def.'s Br. at 13.)

Claimant responds that "the ALJ cannot simply ignore GAF scores." (Pl.'s Response Br. at 4.)

The undersigned finds that contrary to Claimant's assertions, the ALJ did not disregard the opinion evidence from Mildred Mitchell Bateman Hospital when considering Claimant's disability and functional capacity. Although he ALJ did not specifically note the GAF, he clearly considered all of the hospital reports:

> [T]he most recent records from September 18, 2009, revealed the claimant became unresponsive while being arrested. While being transported to CAMC, the claimant became agitated. The record reveals when the physician began to enter the room the claimant was "already belligerent with the staff trying to hit our staff and a security guard, and at that point he was being restrained for his safety and ours" (Exhibit 14F, page 10). The claimant reported he was "not sure" why he was in the hospital, but stated "he just [wanted] to die" (Exhibit 14F, page 10). Of note, the record also indicates the claimant had been to the emergency room earlier that same day and left without being seen; cursing at the doctor and telling him not to do the examination (Exhibit 14F, page 10).
>
> The record reveals the claimant was sent to Mildred Mitchell Bateman Hospital on September 19, 2009 and remained there until his discharge on September 30, 2009 (Exhibit 15F). The claimant reported "I don't have anything wrong with me" (Exhibit 15F, page 2). He denied suicidal or

homicidal thoughts and depression or psychotic symptoms (Exhibit 15F, page 3). A urine drug screen did prove positive for cannabis. However, during the course of treatment no psychotropic medications were used as there was no specific indication for any. The claimant was discharged "with a mental state that was free of psychotic or severe affective symptoms" (Exhibit 15F, page 3).

(Tr. at 23-24.)

A GAF score does not reflect an individual's physical capacity to work but may impact the person's ability to function in a work place or social setting. The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. In the subject claim, Claimant's GAF scores ranged from 40 to 65[1]. The ALJ noted that while Claimant was a patient at "Mildred Mitchell Bateman Hospital...during the course of treatment no psychotropic medications were used as there was no specific indication for any. The claimant was discharged "with a mental state that was free of psychotic or severe affective symptoms." (Tr. at 24.) Clearly, the description at discharge does not describe severe symptoms despite a GAF rating of 50. (Tr. at 310-11.) The ALJ considered Claimant's mental functioning and in his hypothetical to the vocational

---

[1]   61 - 70 Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

51 - 60 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers).

41 - 50 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

31 - 40 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work).

American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

expert restricted Claimant to "low-stress...unskilled...sedentary and light... exertional level" work, wherein the VE identified three jobs in each category that Claimant could perform. (Tr. at 59-61.)  It is further observed that the record shows that Claimant was positive for cannabis abuse at his admission to the hospital, which may have contributed to his behaviors and low GAF score.  (Tr. at 310, 320.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: September 27, 2012

Mary E. Stanley
United States Magistrate Judge

24